Case No. 17-6202, Hispanic Affairs Project A.O. Appellate v. R. Alexander Acosta, we hereby castrate the United States Secretary of Labor, et al., Mr. Lynch, for the appellate, for the appellate. Thank you, Mr. Chairman. May it please the Court, Dermot Lynch, along with my co-counsel, Bill Taylor, William Taylor, for plaintiff appellants. H-2A shepherds work in the United States for years and sometimes decades on end. They are permanent fixtures on Western ranches. They are by no rational definition performing temporary work as required by the INA. This Court can address DOL and DHS's clear violation of the H-2A provision, and the most straightforward approach implicates one of the regulations that DOL issued in response to Mendoza v. Paris in this Court. That regulation, 20 CFR 655.215b2, allows shepherds to stay in the United States for what DOL calls 364-day periods of need. The regulation is invalid because the reasoning that DOL relies upon in support is both arbitrary and capricious and cannot be squared with the H-2A provision. DOL provides this flawed reasoning in the final rule, JA 620. There, DOL does three things. First, it recognizes that H-2A work must be either temporary or seasonal. Second, it concludes that shepherd work fits in the temporary category. And third, it says that the 364-day period of need complies with the definitions of temporary in the DOL and the DHS regulations and is consistent with the INA. As we explain on pages 30 to 31 of our opening brief, this reasoning fails on at least three grounds. Can I just ask, your position is that the shepherds could never be considered temporary or seasonal. Is that right? That's correct. Given what DOL has recognized, given what the administrative record, which is an abundance of evidence both within and without the administrative record establishes, there's a permanent domestic shortage. Right. And the other side says that that specific complaint, that argument, wasn't raised in the comments. Can you point me to a comment that discusses that point, that they should never be given temporary visas? Let me, I have two responses. First response is point me to the comment that you want to rely on. It's AR-1996. It's the comment that we've been debating about, right? That's the one that says the best way to reflect the distinct temporary and or seasonal needs would be to separate certification periods that reflect the nature of the work. And on that same page or on the next page they also talk about how that should be required, according from the language of the comment, right? But that doesn't say you should never give a temporary or seasonal pass. It says you should separate into two separate seasons. I think that what was implicit in what they were saying there, they were responding to a question that was asked by the Department of Labor and the NPRM. They asked, how do we make this visa program comply with temporary or seasonal needs? Your position is it can't comply with a temporary or seasonal certificate, right? Yes. But that's not what they say here. They talk about a separate three-month certification is appropriate. During the spring months, a nine-month certification for open-range herder would be sufficient to encompass most open-range work. If you were here arguing for the two shoulder season kind of things and the thing in the middle thing, then you would have something. But your position is that they can never get a visa, a temporary or seasonal visa, right? With respect, I don't think that's quite right. I thought that's what I asked you to begin with. Maybe I misunderstood your question. Apologies. We believe that the shepherds could receive seasonally-based H-2A visas or they could also receive the 1153 visa that we talk about elsewhere. But they could receive a seasonal visa for the lambing season and a subsequent seasonal visa for the herding season. We think that's the only way that shepherds can be – what is said in the H-2A statute can be squared with the type of work the shepherds are performing. I want to – I'm sorry. Once again, number item one of your argument, DOL and DHS cannot approve H-2A visas for shepherds because shepherd work is not temporary. My question is, is that argument, which is your number one argument in your brief, raised in the comments? We think that it was in response to the question. We do not think that you need to reach that question either because DOL itself raised the issue. I'm pointing to JA-620 in the final rule. DOL on that page very clearly said these visas have to comply with the temporary or seasonal requirements. They raised the issue. They said that the temporary bucket is what we're using here, and that is in compliance with DOL and DHS regulations. I point you to the 2014 NRDC case, which we cite on page 47 of our briefs. If DOL itself raises the issue, that is sufficient. I've actually – the facts of that case, the 2014 NRDC case, are illustrated here. That is a case about EPA allowing for an exemption from a hazardous waste materials exemption. The challenge that was brought in this court was whether or not that was statutorily authorized. The same waiver argument was raised. There was a similar – this court said, you know what, we're not certain whether or not that issue was raised in the comments. But in reaction to the comments, EPA definitely raised the issue as to whether or not the exemption it was using here was statutorily authorized. So I think that you don't have to reach the question as to whether or not the commenters raised the issue. I think that on two separate grounds, actually, the 2014 NRDC opinion disposes of the waiver issue. First, because DOL itself raised the issue, and second, because in the language of the opinion, one of the key assumptions that was at play in that analysis was that they did have statutory authority. I'm sorry. Can you just point me to, again, the precise language you said, I think you said JA620? JA620, the first column, the second full paragraph. In that paragraph, which the government hasn't addressed, we addressed quite clearly on page 47 of our brief. Which sentence in that second paragraph? The second full paragraph talks about the first – let me pull it out here. The first – this is the entire section, right? These two pages are the entire sort of analysis of why these visas can fit within the temporary bucket. As we've stated, as we've stated on page 31 to 32 of our opening brief, the analysis in that second full paragraph on page 620 is flawed. It's completely flawed. The government is – that right there is the issue being raised. It is squarely on point with the facts of the EPA – of the EPA, the NRDC case from 2014. The site is 755 F3rd, 1010. And it was raised toward the end of the opinion. So I – with respect to your question, Chief Judge Garland, I don't think you need to reach the issue as to whether or not the commoners made it. You didn't reach that issue in the NRDC case, and we think that that squarely resolves the waiver issue. Let me talk about the merits as to DOL. We think that the analysis on page 620 does not comport with – is arbitrary and capricious because it ignores abundant evidence in the administrative record that says that, you know, all these H-2A shepherds are here for years or decades on end. There's one rancher who says it's misleading to even call them temporary because call a stay-to-stay. Somebody who worked in the United States in the same job for 20 years is not performing temporary work. So this merit, just to some understanding because there's many claims raised in this case, the merits argument that you're launching into now was not considered by the district court. The district court disposed of this – of the DOL challenge. There's two challenges, right? So the labor certifications with DOL, the district court resolved that on the waiver issue, which we think was erroneous, especially given the NRDC case. And the DHS, which the district court resolved on what we think is an erroneous interpretation of what we call the other employment regulation. If I may just make one brief comment on the merits, or I can also talk about our – I didn't mean to cut you off on discussing the merits. I just want to make sure that I understand that the argument that you're making now is one that hasn't been resolved on the merits by the district court. Yes. And just with respect, we mentioned this in our reply. We think that you can reach the merits. The last time the Shepherds were at the D.C. Circuit, this is exactly what happened. You reached the merits argument after the district court had disposed on procedural grounds. So as to the record evidence here, right? Just for one more second. Sure. So in the NRDC case, it says that it was okay because the NRDC understood the comment to be the kind of attack that was now being made on appeal. Where in the federal register notice – this is for the 2015 rule, is that what we're talking about? The 2015 rule, yes. Again, where it's – you understand – where the agency understands it's being told that there can't be any temporary visas? I think that's squarely addressed in the second full paragraph. You know, the first paragraph says we have decided – Which page? I'm sorry. 620. It's 63,000 of the federal register. The previous page – you can read it in full – talks about here's our analysis, here are the different seasons that could have, you know – that are, you know, available. We reject that line of reasoning. We think that Shepherds are performing temporary work. But if you look at the framework in the matter of RT and a number of these different cases, that doesn't line up with that second full paragraph. This is – I'm sorry to keep interrupting you. This is in response to the idea that there could be separate seasons, right? Well, but I think that if you look at what DOL is saying here, they're saying – and, you know, our position is, right, they said in the NPRM we might have a problem. Is – does this work comply with the temporary season requirement in the INA? Response in the final rule is the issue is resolved in a flawed way on page 63,000. I think we say the same thing on page 47 of our brief. If you don't agree with me that NRDC and the posture that we think we've outlined in the rulemaking here is exposed to the waiver issue, I think you have to address the issue as to DHS. I can talk about that or I can talk about wages. We'll let you talk about both. Oh, good. Thank you. Okay. For the DHS challenge, I just want to flag two important things. One, the government's litigation strategy or DHS's litigation strategy should be deeply concerning to this court. It's using bureaucratic constructs to sort of deny reality or defy reality here. The reality is most of these shepherds are here for three years. There's an OLC memo, JA389, that squarely says shepherds cannot be here for three-year periods of time, and yet that's what's happening. The government's only response is to raise this Lujan programmatic attack argument, and we think that they're just capitalizing on the unwritten nature of the policy. So just so I can understand exactly what you're saying about DHS, unlike with DLL, you're not pointing to a regulation that you're challenging as arbitrary and capricious. You're saying there's an unwritten practice or policy of granting temporary status in a situation in which, by nature, the shepherds are not temporary. I believe that that is, with one clarification, I think that is what I believed until I received a response to the notice of supplemental authority last week. There, the government, for the first time, actually addressed the fact that shepherds are here for three years. And at the end of that supplemental authority, they say, at most, we have all these affidavits, right, and they kind of dispute whether or not they're admissible here. They say, at most, the affidavit suggests that unidentified shepherds stay in the United States for up to three years, which, as the district court explained, is explicitly permitted by DHS regulations. If DHS is now taking the litigating position in this case, that three-year shepherd visas are legally authorized, that is interpreting the law. That is the equivalent of an agency rule. And I think under the Venetian Casino case, that gives you final agency action to reach the issue. Aren't they saying it's in the regulation? I thought that's part of their argument, that you should have challenged the regulation. They say we should have. There is no regulation. The regulation, if the regulation were actually enforced, as it should be under a matter of RT and the wide framework about temporary work, we wouldn't be here. No shepherd would receive a visa because the DOL or DHS would review the payroll records, as we, you know, talk about the Aldolf case explains, like, how you determine temporary needs. The ranchers would have all these payroll records that, you know, confirm that the work is permanent and not temporary, and every single visa petition we denied. So your problem with DHS, but for the supplemental authority point, and just bracket it for a second, is that the regulations are fine. It's just that they're not being applied. There's an unwritten exemption, or there might even be a written rule that we haven't received, right? Just to clarify, the position of DHS below is our argument is confusing. They're just capitalizing, again, on the unwritten nature of the exemption that they've created here, and we think, you know, it is possible that there is in some vault at DHS something that says, listen, shepherds are allowed to stay here for three years, unlike all other H-2A workers, because they're X. I don't know the answer to that question, and DHS has provided it for me, and I think that that's a problem we have here, right? We're in here looking at your – the last complaint here is the second amended complaint. Second amended complaint, yes. So the district court said you didn't make this challenge that you're making now, and as I look at the numbered causes of action, beginning on J-66, the first one is about the 2011 shepherd. Is it Tegel? Tegel, I mean Tegel. Tegel, all right. That's not what we're talking about here. No, well, not – we have one minor claim as regards to Tegel. Okay, but we're talking now about a policy of cost of renewal. Right. Second cause of action is the same. Third cause of action is the same. Fourth, same. Hold on one second. No, I'm good, sir. Fifth is about the 2015 rule, same six, seven, eight. And then you get your quasi-contract claims. And then for the prayer for relief, it's issue a wage determination, of course, with the regulatory framework in the Tegels and join the 2015 rule, approving of the 2015 rule. So where is the cause of action that you're raising here, that is a policy of permitting essentially permanent? So as to – I can provide you on a rebuttal of the exact types, but in each of those cause of action we say this is arbitrary and capricious because DOL is, you know, approving the labor certifications and DHS is separately approving the visa petitions. This issue was actually litigated in the motion to dismiss, which is not subject of a cross-appeal here. But the district court's opinion mentions that this claim wasn't raised in the complaint. There is a bit of a tension between the reasoning of the denial of the motion to dismiss and what the district court says at summary judgment. It's not really that unusual. One happens very early on in the litigation. One happens later in litigation. So from our perspective, DHS raised two arguments in the motion to dismiss. They first of all said that when we pleaded within each of those causes of action that DHS was taking these illegal actions, that they weren't on sufficient notice of the policy that we were talking about. We responded that, yes, we are. You should be on sufficient notice because we are, you know, we're challenging what is effectively what we call a rubber stamping policy. It has to be. I think it must be from the fifth and sixth causes of action in paragraphs 112 and 114 because I think that's the places where you mentioned DHS. Yes. I don't have to. I will trust you on that. Right. And if you look at the denial of the motion to summary judgment, the district court adopted our view that we did raise a challenge to DHS's policy of rubber stamping the labor certifications, rubber stamping the visa petitions after the labor certifications were approved by DOL. Well, I don't read the complaint to say anything about rubber stamping. I guess because, I mean, that may be the argument that you made in effectuation of your complaint. But what your complaint says is that the actions of DOL and DHS authorize the creation of permanent herder jobs that are not temporary. Right. And what DHS then said, DOL, you know, DHS responded, moved to dismiss, said that we were challenging, we couldn't bring this type of a challenge to this policy that creates a permanent labor force. And we responded in the motion to dismiss by saying, yes, we can. Here's how you should be on notice of this. And, you know, we litigated that issue fully in the district court. Can I pause for a minute? Sure. And what are the 2015 special procedures? Is that the, what are the 20? The 2015 special procedures are what DOL has used to. The sentence about DHS's actions in paragraph 112 challenged DHS's actions in issuing H-2A herder visa authorizations in accord with the 2015 special procedures. Right. It's not about a policy that's different from the DOL rule. It's from following the DOL rule. We think that, you know, as a term of art that we used in the complaint, we said, you know, DHS is effectively authorizing these visas in accord with the 2015 rule because it hasn't announced any sort of its own policy. There's this sort of, I will concede, this kind of bizarre sub-delegation issue where DOL is, you know, taking all of these actions. And it does seem that DHS is sort of the passive player here. And they're not doing anything. But they are, they have a de facto policy of approving these visa petitions. Do you have the complaint in front of you now? I do, yeah. So the relevant pages, it looks like they're 68 and 59. And can you just say which? It seems like it's 112 and 114 that mention DHS at all. Is that what you're eyeing on, or is there something else that we should be looking at? I would, yeah, I can also submit a 28-J to give you further. But if it's 112, not an issue. The prayer for relief also. And I believe that this report relied on the prayer for relief. And is 114 relevant or is it not relevant? Never mind. To the DHS challenge, the one that DHS has identified. It's a de facto policy of allowing non-temporary. Yes, yes. We think that the APA violations here are that it's arbitrary and capricious. It hasn't been explained. It's not the product of reasoned decision-making. And that it's ultra-various of the H-2A statute, of H-2A provision, which defines temporary work much more narrowly than what's at issue here. If we had been told that we hadn't provided sufficient notice to DHS about our claims with these allocations, we would have amended that the district court agreed with our position in denying the motion to dismiss that claim and allowing our challenge to DHS's policy to proceed. So what we did was we said, okay, we have plausibly alleged a policy. The district court agrees with us on that. How can we find evidentiary support for this? And we did what was done in the RLR case. And Judge Boasberg also looked at, you know, well, it seems like we're going to have to litigate the existence of this policy before we decide whether or not it's the product of reasoned decision-making. And we did that as best we could because it's hard to prove a policy without having sort of any written documents. But you can see the policy in effect. We submitted five or six different declarations from actual H-2A shepherds. One of them has worked in the United States for nine years. He would be a U.S. citizen today if he was given the right visa the first time around by DHS. We have all these different declarations from American workers who are asking for work on these ranches, and they can't get it because the ranchers can pay $4 an hour and they can rely on year-round shepherd labor, foreign shepherd labor from this sort of captive workforce. Can you explain to me, so the authorizations that come from DHS are for 354 days. How does that turn into three? Who does the renewal? Is that labor? Is it DHS? And I assume at some point the State Department is going to extend the visa. I didn't quite understand the renewal process and how you got to the three years. I got that you were arguing that. Who's doing that? Who's making it? They're line sort of officers who will – In which agency? First of all, it's sort of like a conveyor belt. It goes to DOL first. They have to approve. For a renewal? For a renewal and for the extension, right? And then it goes to – Is it the exact same process to get the extension? I just didn't see much discussion of the extension process, which seems to me that's really the crux of – the problem isn't that they're issued 364-day visas. The problem would seem to be, if you're going to show – if one were going to show an unwritten policy or to allege one, that the renewal process – I think it's easier to grasp the renewal, but I actually think the initial visa, the first visa, is also illegal because there would be obvious evidence that there's a permanent domestic labor shortage. If you have that, RTE case says that that's just positive, right? You can't get the – just as the matching list in that case couldn't get the initial visa, the shepherds here shouldn't be able to get that initial visa for the 364 days of need. But does the renewal go through the exact same steps, though, that both labor and DHS are implicated in that? Does the employer go on day 360 or something to labor and – Yeah, I mean, as a practical matter, they generally go before – they want some lag time, so they'll renew, say, two months out from the end of the first labor certification, and then they'll start that process. But it's the same process for – Same process for the renewal. As well as it is for the original. And did you have evidence or want an opportunity to get evidence of the volume of renewals? Or how often are renewals? So we – I think we do have – we have evidence. I think we've submitted all these declarations. John Doe said I've done this for nine years. I got – I did one contract. I had it renewed at the end of the first year, second contract, third contract. The same thing is said by, you know, Ricardo Perez, who's HAP's executive director at JA332. There's an expert – you know, we have the Alvarado Declaration, who also says I've, you know, worked for years and years helping shepherds, and they're all working here for three years. So if the question is do I have those pieces of paper that say this is renewed in front of me, I don't. I'm not sure that it would be necessary for this court to rule on the DHS challenge because we've provided – I think that litigating the question of the existence of this policy is what this court did in Venetian Casino, and that question is a very simple question, a summary judgment question. Is there a genuine dispute of material fact that the shepherds are here for three years? The answer to that question is no. There's no genuine dispute. We've put forward – you know, there must be – we've pointed to at least 200 or 300 different instances where these shepherds have been working for a three-year period, and the government has never put any factual support in the record to rebut that. That's for you to get summary judgment in your favor, right? That's correct. Whereas at this point, the question is whether we should overturn the grant of summary judgment in the government's favor. Well, so I think that – first of all, I think that – and we're talking about the DHS challenge here. The reason we lost on summary judgment on the DHS challenge is because the district court misinterpreted what we call the other employment regulation, right? You know, we provided analysis from when that regulation was first issued in 1987. It's pretty clear that other employment is about other jobs. It's from moving from being a H-J peach picker to being an apple picker. So that doesn't authorize three years of work in the same employment. We provided that analysis in our opening brief. The government didn't rebut it. I also think that, you know, what the district court said is this is – you know, this is a time-bar problem for you because you should have been challenging the other employment regulation. We think that's wrong on two grounds, right? I guess my point is different from that, at least the attempted point is different from that, which is that at this – the posture of the case right now is that the district court grants a summary judgment in the government's favor against you. In order to get that vacated, if you didn't have any evidence at all in the record on a genuine dispute of material fact on whether Shepherds, in fact, are here permanently, then the grounds on which the district court may have granted summary judgment against you might not matter because if you don't have any evidence, then there's no genuine issue anyways in supporting your claim. So it seems to me your point is we did raise a genuine issue because we introduced these affidavits. That's all you need to know. And I apologize if I misspoke. We actually think the problem here is that the government hasn't raised a genuine issue. We've put forward mountains of evidence, and we think that the proper resolution of the DHS claims is as follows. Either dispose of the time-bar argument because it wasn't raised below and it's non-jurisdictional. I think that the Spanish case is a drive-by jurisdictional ruling, or the legal analysis doesn't support that that's actually what we're challenging. And then the third step is what this court did in Mendoza, which is actually reach the merits. I'm just saying we wouldn't have to do that because in order to – I think this is a point potentially in your favor. I'm not saying that we're necessarily there, but which is that for you to get the summary judgment grant against you overturned, you wouldn't have to prove that you're entitled to summary judgment. You'd just have to prove that you raised a genuine issue so that it should go back on the question of whether – Oh, to have like a trial on whether or not – Or whatever. I mean, I guess the court just hasn't looked at it in the way that you think it should be looked at. Am I wrong about that? We would be very happy to litigate those facts below, but we think that the record is sufficient at the court here. You think it would be pretty straightforward below. Below, but I think that you have the ground solution. I think Mendoza provides a path forward for that. I did want to just – I'll talk about wages in a rebuttal, but the government does raise this question about if you reach the issue for DOL, is that enough? Is that a final agency action? I think they talk about if you reach the issue that 215 – if you reach the issue that the regulations they issued is arbitrary and capricious, we think that that regulation is final agency action. We don't think there's any finality from there. I don't have any questions on that one. Okay. I have one question. Not necessarily directly relevant, but I'd like to understand it so I understand my case. You represent both American shepherds and foreign shepherds. That's correct, in an organization. I understand. But how are the interests of the American and those looking for visas consistent with each other? So we – You know what I'm asking, right? So if all the foreign shepherds get permanent visas, will that drive the Americans out of business? So we litigated that issue on the motion to dismiss, and we think that it's a win-win for both the American and the foreign shepherds. What would happen is one of two things. You rule in our favor, and DOL and DHS have to go back and, you know, figure out the seasonal visas. And I think that if they do seasonal visas, they have this idea, right, that we can do this monthly wage, but the monthly wage wouldn't work for certain seasons, especially the lambing season, so they'd have to do an hourly wage, and that would raise their wages. But it would mean they couldn't save it for years. Well, I think that it would be – I think it's hard to expect. I don't think we have to – I think that in the short term, you would have – you would probably have more foreign workers continue to work on these seasonal H-2As, even if you're earning more money. Or the other option, right, is there's an entire separate regulatory framework for shepherds. There's so much shepherd stuff in the, you know, CFR here that would allow them these green cards. And I think that the district court accepted this reasoning, and it, you know, hasn't been cross-appealed here. If these workers had green cards, they would vote with their feet to move to different employers, right, because they wouldn't be stuck with the visa sponsor. They could go work in different industries, and that would create a natural increase in the wages, right? And that's actually how it worked, right, in the 1950s. Would it not displace the American shepherds? The – I mean, I think it would – I have no idea how the economic – advanced by whatever result occurs here. I think – well, I think that the interests of both are advanced because it seems pretty clear that the wages for those jobs would go up, and I think that the rising tie there would raise the shifts of both workers. Sure, in the long term, maybe some of the H-2A workers would be displaced by American workers because it would cost less to – you wouldn't have to fly them up from Peru, for example. I don't think – if what your question is driving at is whether or not we have a – some sort of Article III problem with representing both those – I really don't think so. I mean, I – It might be a problem for your class action, but it's not really a problem for us right now. Correct. I think the class action is in Detroit or something. Is it somewhere else? Denver. Denver is where most of the – Oh, the D. Yeah, I got you. Say again? It starts with a D. It starts with a D, you know, in the middle. That's where most of the shepherds are, so it got moved back there. All right, let me just ask if there are questions about the wage issues from the bench, because I don't want you to wait for your rebuttal on that. All right. Are there questions? Okay. All right, we're now 20 over. Oh, okay. Okay. Good morning, Your Honor. My name is Heather Sacklower, and I'm here on behalf of the government defendants. I'm going to say that they are seeking review of unwritten policies, but as you know, they do not raise this claim in their complaint, and their arguments about the alleged policies change each time they file a brief. I just understood finally today what they have been arguing about the DHS regulation that allows a specific H-2A worker to stay in the country for up to three years at a time. That regulation does not limit the category of agricultural employment or the occupation that an actual H-2A worker can perform well in the country. It's not, as you said, I think an apple picker or a corn picker. It's based on the need of the petitioning employer. All right, so in the industry at issue here, Shepherds, do you dispute that there's a high volume of requests for renewals that are constantly granted? I don't have the data. It's not in the record. Plaintiff didn't provide it. He did cite other DOA data, which is publicly available on the website. I can personally go through and pull out the Shepherds and look at their dates and the renewals and compare them year to year. But that data isn't in the record. But does DOL have that data? I don't personally know whether they've compiled it and compared all of the various years. Wouldn't they just know how many renewal requests they got in a given year and what their action was on them? They would be able to compile that, yes. What do you mean when you say you only just realized their argument about Section 214? They make it pretty clearly on page 13 of their reply brief. I wasn't understanding that they believed that the agricultural employment as a general matter rather than an employer-specific matter was being assessed. The regulations that DHS has, and as explained in the Office of Legal Counsel memo that plaintiff's counsel cites, explains that it's based on the petitioning employer's need for the work, not the general occupation. So what does it mean when it says an alien may remain longer to engage in other qualifying temporary agricultural employment? What does other mean? It would be something that a party petitioned for. But other still has to be something other than something. Other than what? Other than what they were doing before. DHS assesses the petition based on the employer that filed them. I understand. But what does the word other mean? It limits on an individual's stay. An alien may remain longer to engage in other qualifying temporary agricultural employment. What does it mean? I don't have a specific answer to that. So then you can't really say that it doesn't mean what the other side says. That would be correct. I was understanding that regulation, and I believe, but I would have to check, that it pertains to the type of work, or it pertains to the petition that is being filed by the employer to employ that worker. But we don't have data on whether what plaintiffs allege is happening. He hasn't sought that from DHS. In his claim, he only challenges the actual DOL 2015 rule. He agrees that the case should be decided on the administrative record, and specifically the administrative record produced by the Department of Labor. And there is nothing in that record that pertains to DHS's decision-making process. Can I just ask a conceptual question? So in order for the visa ultimately to be approved, and let's just take DHS's role in it. Okay. Then that's the petition, that's the approval of the visa petition, that's what DHS does? No. So DHS approves a visa petition that is filed on behalf of a beneficiary. Sometimes they can be unnamed in the HTA process. Right. So it's not the certification stage, that's DOL. But then we get to the visa petition stage, that's DHS. Correct. And that's never issued for more than 360 days. Right. So my question is this. Suppose it's true that shepherds are essentially permanent, that they're not temporary. Then it should also be true that visa petitions that are presented on an assumption that they're temporary shouldn't be approved because, in fact, they're permanent. Is that true, or do you agree with that, or do you disagree with that? Well, I could speculate. That's my own personal opinion. But DHS's interpretation of their own statutory language Congress has asked them to interpret is not in the record. I guess it's a very basic question. Maybe it's so basic that you're not perceiving it this way. As I understand their claim, they're saying, look, this is a regulatory regime that's supposed to allow for temporary visas. Yes. But really it's a sham because nobody's really thinking that these are temporary. They're actually permanent. Everybody understands that the shepherds are coming here for a more permanent basis than 364 days. And so whatever DHS's role is in authorizing these supposedly temporary petitions, DHS should be doing something different. They should be denying them because they're not actually temporary. They're, in fact, permanent. So they shouldn't be getting these visa petitions. It's interesting that nobody of the 516 comments that were submitted during the rulemaking proceedings, nobody raised this as an issue, that a 364-day period, a maximum period, would be a problem. And plaintiffs didn't want it. Take a look on page 62999 of the final rule. It says, comments on temporary need. Several employer comments indicated that they re-employed the same H-2A workers over the years. Yes, and that could be. We don't know, and it couldn't possibly be consecutively given that you can't get a certification for a full year. We don't know what the temporal period is. There are many agricultural employers that employ H-2A workers over the years for a shorter span of time. So it could be seasonal. You are disputing that they normally re-opt for three years? I'm saying that we don't have that answer in the record. It's not clear. There isn't – the plaintiff hasn't provided the data to reach that conclusion. And this is with respect to the DOL rule, 62999 and 6300. Am I understanding that right? There is anecdotal evidence that some employer has said this. It's not – No, I'm just saying that it's not with respect to DHS's practice. This is with respect to the DOL rule. Okay. Is that right? I'm sorry, I didn't – The exchange that you were just having with Chief Judge Garland about 62999 and 63,000. Is that with respect to the DOL rule? This is all DOL's conclusion. And DOL makes a separate assessment from DHS. And the ultimate assessment is made by DHS. DOL is assessing the effect on the labor market. I mean, DOL is assessing the effect on the labor market. And DHS is the final arbiter of that language defining the H-2A class. So with respect to the DHS piece of it, I guess I'm trying to understand what you think plaintiffs are required to do. Because if they say – if they just start with a legal premise, the legal premise of which is that if these workers are, in fact, permanent, they shouldn't be getting approval on a temporary basis. That seems to – correct me if I'm wrong, but that just seems to me to be an indisputable proposition. That seems just right as a matter of law, that if, in fact, they're permanent, they shouldn't be getting approval on a temporary basis. Yes. Now I understand your question. Yes, if they are permanent workers, then they shouldn't get approval on a temporary basis. Right. If it hasn't identified any discreet instance in which this has happened, which is how APA review is supposed to work. So that's the question. So that's what I want to get to. So now we agree on the legal presumption, the assumption that there is, at least in theory, a potential claim here. Then the question becomes what are they supposed to state in order to get that claim heard? And if they say, look, we've got some people that – for whom we have declarations who say that they just got automatically renewed, so it seems to us that they're basically permanent. And if the allegation is that DHS uses a practice of just rubber stamping this, they don't even look to see whether these folks are, in fact, temporary or permanent. They just assume that they're temporary when, in fact, they're not. And maybe DHS has some secret memo in a file somewhere that says we're going to approve these even though they're, in fact, temp – even though they're, in fact, permanent, we're just going to approve them anyway. They don't know any of that. They're making an assertion based on the folks for whom that they have declarations and an observation as to the practice. And what do you – I'm not saying that you're necessarily wrong in saying they need to do something other than that. I'm just trying to understand what you're saying. Well, that would suggest that DOL is violating its own regulation here that says that they're not going to issue a certification for a period of greater than 360 days. Yeah, I think they are. That's not a possible way to get, say, consecutive three-year – But I think they are. I think by their own – as I understand their brief, and they can correct me on their model, but as I understand their argument, they are saying that DHS is not acting in compliance with its own regulatory framework. In terms of – so there would never be a period of more than 364 days approved that would go. Well, it's a renewal. That's a renewal. Couldn't you get a renewal on the next day? So as far as it goes, the back-to-back with the 300 – I don't have – I'm sorry, I must have misunderstood your question. I got you meant consecutively without the extra day, the 365 days of the year. I can't speak to what DHS's position would be on the 365-day consecutive entire year. Well, you have a – there's a renewal process, correct? There is no renewal process. But there is an extension of status for the petitioner, and that's – How long can the extension be for? You would need a labor certification, so it could never be more than 364 days. Right, so I can do another 364, so that – And can you do it again for another 364? So all right, so it's three years – it's three days shy of three years that they're getting. So if plaintiffs believe that's a problem, then I think that they should petition DHS to either adopt the Shepard-specific rule or to – Well, you already have a rule that says that the need – that employers need a revision that's going to be temporary and will not be more than a year except in extraordinary circumstances. And do you have a sense of what extraordinary circumstances mean? What has DOL said – sorry, DHS or DOL? Either one said about – I guess these are DHS, right? So DHS has said they have extraordinary circumstances to have more than a year. Is that being demanded of the employers? If so, what are they showing? I wouldn't know because plaintiff hasn't pointed us to an action in which this has allegedly occurred, which is plaintiff's burden to bring an APA claim. What if somebody came forward and said, we want the 364-day visa? By the way, we're going to – everybody understands what's going on here. We're going to get it renewed 27 times in a row. We're just going to do that. And you know that. We know that. Everybody understands that this is just going to be basically an automatic renewal 27 times. And your view is that that's perfectly fine? My view is that DHS has not spoken to this because plaintiffs haven't presented it as an issue to them, and nobody presented this as an issue during DOL's rulemaking proceeding, where worker advocates and the organization that initially employed plaintiff's counsel submitted a comment, and nobody presented this as an issue. I guess I just don't understand that. I mean, I guess you've got your procedural arguments, but their brief is filled with, come on, this is going. And it's filled with evidence from the Range Association, and it's filled with evidence from Shetland. And so I find it a little odd that DOL and DHS wouldn't in the course of this litigation have said, are we doing that? You weren't confused that that was their argument in this case, were you? I was not. I think that they have not presented this to DHS to provide an opinion on, and there is therefore no way. What do you mean present to provide an opinion? What they're saying is you're doing stuff. Your folks are out there stamping these visas, knowing that they're going to get renewed, and you're stamping the renewals. What opinion are they supposed to ask for? Well, they say that, and they point to some anecdotal evidence, but most of it is based on. But you never denied it. Well, most of it is based on. I don't have the data to confirm or deny if a consistent 364-day request is being. They quote. Sorry, I think it's DOL. I can't remember if it's DOL or DHS. They cite documents from them saying that, you know, these folks have never really been temporary or seasonal. I think that's the language that you're pointing to. It does not say all, which is plain and plain. You're seeking to include categorically every single shepherd petition. DHS doesn't analyze the petitions on an occupation-specific basis. But you say that. I mean, what they're saying is, sure, they have to go on an individual-by-individual basis because there's nothing to approve until someone presents them something to approve. But then there's a de facto, a policy of not looking to see whether, in fact, this person is going to be temporary. It's just a rubber stamp. He hasn't pointed to any evidence that this is continually happening. You know, he could have sought data to show that this is. J.A. 884 has the Department of Labor saying, we follow this procedure, irrespective of the fact that most sheep rearing jobs are neither temporary nor seasonal in nature. We let them in for a cumulative period not to exceed three years. The actual separate, yes. The Department of Labor concluded that most shepherding jobs are neither temporary nor seasonal. I believe that was in 1991. It was 2001. I'm sorry. Has it changed? I don't know. It wasn't asked or presented as an issue to certify these petitions for up to 364 days at a time during the rulemaking. And so the department put the question out to the public and asked, you know, should these be certified on different seasons based on the lambing season and the more open range season? And there wasn't a clear consensus on whether there were particular seasons. And so given that they reviewed the evidence and concluded there was no reason to depart from their historical practice. The historical practice being treating them as seasonal and temporary even though they're not. Well, they determined that 354 days or less did meet the temporary standards, and nobody challenged that. And to allow plaintiffs to come a little over two months after the comment period ends and raise it in court, you know, the whole purpose of notice and comment is to provide the agency an opportunity to respond. Well, to put the agency on notice, but I don't know. I should think the agency would be on notice of what it's doing. So it's not a question of an argument. It's an agency on notice that was not only doing 364 days, but then renewing them routinely for three years. Does the party have to come say that to you? Aren't you already on notice about your own? You should know what your own practices are. No one should have to raise that to you. Well, they concluded that a period of 364 days would be temporary. Yes, but what they don't do is then go, and we know already because we're the ones doing it, that we renew that all the time. And so when we say 364 days, we really mean three years. Did someone have to say to you that? Or are you not charged with knowledge of the practice you're already engaged in? If you're not doing it, that would be the case. I think somebody would have to suggest that that would not comport with the regulation. But either way, DHS, whatever the Department of Labor decides on a particular application, then DHS has the full authority to look at it and say this is not temporary. And they are the primary interpreter. They're either not doing it or they've decided that three years is temporary. Those are sort of the two. They're either not doing the renewals or they've decided that three years are temporary. And it seems to me as to either of those, the agency is on notice of what it's doing. We don't know. They could be asking for periods of six months once a year for six months. You all have the extension process. It's your extension process. And so you would know already whether you're doing it a lot or not and what kind of showing your need, extraordinary circumstances, before you're going more than 364 days. I think to evaluate that, you would need the actual data. And that's why the ACA requires and parties the points to a discrete action. You have that data. They don't have it. The DOL data is publicly disclosable, and the plaintiff used it and calculated specific hours requirements. So then you have access to that same data. So you can answer the question for us. If we wanted to know the answer to that question, you could answer it for us. You said it's publicly available. You would have to. All of the data is publicly available. You would have to sort it and pull out the various employers and the Sheepherder positions and analyze it. I mean, there isn't a specific. But you don't need to be through all the Sheepherder positions and let's compare them year by year. If the plaintiff's counsel had wanted to do that and did access that data for his wage claim, he could have put together a chart showing what, in fact, happens. But I think this is all sort of beside the point because the APHS doesn't allow for a challenge list that's on the fact-specific petitions. That's what I don't understand. Why not? Because if, at least with the DHS piece of it, I know you have an evidentiary objection, which is that they should have put together more data points and could have presented the data differently in order to get over the bar of summary judgment. They didn't even raise it initially in the complaint, I guess, was the approach. They didn't raise what initially? The rubber-stamping, as they call it, idea. How do you read the 6th County complaint? Half of the complaint says it is with respect to the 2015 rule and plaintiff submitted a status report to the court indicating that they agreed the case was to be decided on the administrative record and that the record consisted of the record that GOL certified and submitted an index at ECF. Well, they're saying what happened. Go ahead. On the complaint, for example, paragraph 114, little i, says authorizing permanent harder jobs that are not temporary or seasonal. So that's their claim, which I think is really consistent with what they're saying now, authorizing permanent harder jobs that are not temporary or seasonal. And then it points to DHS's role in doing that. DHS's actions in authorizing H-2A visa petition violates this because what they're doing is they're authorizing permanent harder jobs that are not temporary or seasonal. And they allege that DHS is doing this in accordance with GOL's rule, but DHS is not bound by GOL's rule or GOL's determination. So let's just hypothesize for a moment. Let's say it is the case that more than half of the Shepard visa applications are renewed every single time for three years. Now, they would have an argument that that's in violation of the requirements of temporary and seasonal, wouldn't they? Whether or not you would agree, they would certainly have an argument that that's not temporary or seasonal. They would have an argument, but I think this is more analogous to something like Lujan, where Justice Scalia said there may be problems in this program, but you can't challenge it. Yeah, because that was an entire program of changing everything with respect to land use. He said that was no more identifiable as an agency action as the weapons procurement program or the drug interdiction program. Here it's a very specific action that's being targeted. It's the two-time renewal of one-year, at the best, visas. That's a lot narrower than what was going on in Lujan. But if they could bring a claim like that, then they should have at least, first of all, not agreed that the case was to be decided on the administrative record because I don't think that's the GOL rule. Okay, I think we understand your procedural argument and your evidentiary argument. But imagine, I'm asking again as a hypothetical, that the evidence showed that 50% of the visas are renewed at least twice so that shepherds who supposedly are coming temporarily or seasonally are actually here for three years. Now, that is not a Lujan problem. That is a specific policy, which can be decided on summary judgment whether it actually occurred or didn't occur. But that's no longer some widespread attack on a government program. It's a very specific claim that there's a violation of one specific statutory section by one specific kind of action, namely constant renewals. But to get there you would have to assess what the petitioner has provided to GOL or DHS and they assess the policy. So you have what you said was 1990. It was actually a 2001 statement by the Department of Labor. They're not really seasonal. They're renewed. So that would be enough, would it not, if it weren't for the fact it was in 2001? Well, GOL makes a separate assessment which is focused on the effect on the labor market whereas DHS is the one who's the ultimate arbiter. This is an empirical statement by GOL that that's what is happening. This is not a question of assessment. It's saying that there really aren't any temporary or seasonal jeopards. They're here permanently. That's not a question of whether something under one or the other's jurisdiction. That's just an empirical fact they're stating. When they say most, they don't say all, and is that cause to exclude them all from the program? Is it possible that two shepherds standing and sitting next to each other, one is there temporarily for 20 years and one is there even if it excludes somebody else? That doesn't really solve the problem. And certainly it doesn't solve the seasonal problem if they're in the same state. These are all questions that I think that the plaintiffs should have presented to GOL during the rulemaking if they believed that this would be an issue. I can't speak on behalf of you. This is an attack on what DHS does with the DOL application. And they could certainly petition DHS for a shepherd-specific regulation if they believe one is necessary. They could. Of course they could do that, but the question is do they have to or can they bring this litigation? And if you focus on DHS, then you don't have the argument that the challenge to the DOL rule wasn't adequately flagged. If you just focus on DHS' practice, that argument goes away. That does, but they haven't identified any instances in which DHS has done this. You're saying they haven't identified any? Because I thought they have some declarations of actual people. Well, we don't know what was before DHS when DHS approved the petition. But we know it got approved. For instance, his John Doe allegation says he worked for several ranches in Colorado, and DHS was looking at the employer. So we know that John Doe has been taken at his word. He says he's been here for three years. But that would be consistent with the provision that allows an H-2A worker to remain in the United States for three years at a time. Because it's different ranches. That's the argument there. Well, I don't have a position on that because that isn't in the record. That's the whole point of doing review on the record, that we can assess what an agency did or did not do in the position of DHS. But it just seems to me that it's a different point to say, and I'm not saying you're necessarily right or wrong, it's a different argument to say they haven't come forward with enough to bolster their claim than it is to say their claim can't be asserted because they're bringing something that's proposed by Lujan. They're bringing a challenge to an unwritten rule. They're doing something that makes the claim by nature flawed, as opposed to saying they have a claim that by nature actually could go forward. It's just that they haven't done enough to bolster it evidentially. And those seem to be two different baskets of arguments. I see this distinction as how is DHS ever supposed to respond to their arguments, or how is the court supposed to assess concretely what exactly is at issue if they aren't at the minimum identifying a discrete set of actions that we can look at and say, okay, what is going on here? Why couldn't DHS say we do not approve three-year renewals? That is, we don't give two more renewals. We just don't do that. Or we only do that in extraordinarily limited cases. They could say that. That would be responsive, and that would probably eliminate their claim that there's a policy. And you say you have the records to prove it. No, I don't have the DHS records. You said there's public records. There are DOL records that are public. Plaintiffs didn't see through DHS's records. I don't have any knowledge today of how available those records are. Well, if they can't make that statement, it seems like a problem. I don't think you have to get there. But because they didn't present that claim and they didn't identify a discrete set, at least, of actions, are they alleging that every single petition for a chief herder isn't temporary? I mean, DHS doesn't organize their adjudication process through agricultural occupations in the first place. So I don't know that they'd even be able to aggregate the data in that way. You said they come from employers. They do. And DHS doesn't know who the employer is? DHS would be incapable of determining whether the employer was a chief rancher? Perhaps. I mean, the plaintiffs' counsel never asked. So you don't know. When you just said that they don't categorize by kind of employment, you don't know whether that's true or not. I would have to confirm with them. You don't know the answer. I don't. I'm not positive on the answer. That is what I believe to be the case that I would have to check. I know that they review visa petitions on a case-by-case basis. Okay, good question. Thank you. We'll give you two more minutes. Since we didn't talk about wages, it's not really a rebuttal to anything. Since we didn't talk about wages yet, it's not really a rebuttal. So if you just take the time to rebut the statements made by opposing counsel. Sure. These citations throughout are brief, but I just want to put them in one place for the court. There's ample evidence in the administrative record that shepherds are here for three years. Let me just give you the list. JA-478 is a factual finding by the district court that they're here for three years. The district court says some ranchers employ them for 20 years. Judge Garland, you referenced 90 Fed Reg 6299, talking about how they're being employed over the years. JA-795, that's the comment that we quote in our brief about how a rancher is saying calling these visas temporary is, quote, misleading. We have employed people here for 20 years. JA-777 is the Sidaway comment, and that comment is heavily relied upon in the rulemaking. In that comment, Sidaway says that all of our shepherds come here for two, three-year contracts, and often they go back to Peru. In the NPRM, 8 Fed Reg 20314, JA-547, it talks about a permanent domestic shortage of shepherd labor. And then if you go to the industry comment, it's JA-693. Again, there's a talking about permanent need for these workers. That's from Western Range and from Mountain Plains, the two chief employers of all H-2A shepherds. I can provide additional sites, but I think I might be beating a dead horse. Why didn't you try to get discovery on the data from HHS or DOL? We honestly didn't think we needed discovery in light of what seems abundantly clear. An essential element of being an H-2A shepherd is working here for three years. Well, showing the renewal pattern would be pretty powerful evidence, would it not? You want to talk about an unwritten rule, but showing that all these individual decisions are again and again and again making the same renewal decision without any apparent evidence of avalanche of extraordinary circumstances, that would be. Right. So I think that the way that we tried to establish the renewal issue was by pointing to plaintiffs. For example, Plaintiff John Doe has actually been here for nine years and is with the same employer, Western Range. But you're trying to show not that it happened to this person or that person. My understanding is, again with the language and the complaint, that in fact DOL and DH together have created a class of permanent shepherds, not seasonal or temporary. So this person here and that person there seems to be evidence, but a pattern of renewals would be. Right. I mean, I think you also cited the JA-884, I believe, the 2001 rule. Again, that shows what they said in 2001 is still true today. They haven't rebutted that. They say that these are three-year visas. You do one year and then it's renewed and then it's renewed again. I think that that would point to evidence of the renewals. I mean, I am confident standing here today that virtually all shepherds are here for three-year periods. If we need remand to further establish that undisputed fact, I'm willing to accept the judge in the court, but I just don't see... Well, your opposing colleague disputes it. I'm not saying we need remand, but I'm not sure we can call that undisputed. Okay. Well, there's been no genuine dispute. I've never heard anything from the government saying that these are anything but three-year visas, and that's what we've been sort of screaming to the high heavens since the beginning of the case. I don't understand what happens on the 365th day. So it isn't as a practical matter. And if you look at the helpful, from the industry perspective, just so you can understand this, you can look at... We quoted in our briefs, I don't have it in front of me, but the 36-month period, the quote from the Western Range Association talking about this is a 36-month work period, they sort of outline in that same authority how they seek the renewals. They normally ask from DOL for the renewal two to three months before the deadline for keeping the worker in the United States. So there's a bit of a lag time, right? And then a new one starts on what would be the 365th day? What they do is they say this visa will expire on X date. Yeah, I want the visa to begin on X plus one. So there's no gap. Oh, there's not even a gap. Not even a one-day gap or a one-hour gap. It's just a continuation. It's just a continuation. The workers are hardly even aware of it. The touchback you're talking about happens at the end of three years? Yes, that's the rancher's term, and that's for the return over three months. Do you want me to – I did have something to say about wages, but I can limit – The problem is the other side hasn't said anything about the wages either. If it's something that's not in your briefs, I guess you could say it, but then you'd have to explain why it's not in your briefs. Oh, well, I – here's one thing that isn't in our briefs. We – for the wages, we cite the district hospital case on page 50 for the – you have to have accurate – you have to use accurate data, and I think that the core problem with the wage calculations here, both as to the wage figure and as to the 48-hour figure, is the accuracy of the underlying data. We're citing the district hospital case, and that case – that cites the city of New Orleans case, which is 969 F2nd 1163. That's one we can figure out by rolling the case ourselves. Okay, great. Are there further questions on the line? Okay, thank you very much. We'll take the matter under submission. Thank you. We'll take a brief recess also.
judges: Garland, Srinivasan, Millett